UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DARRELL LAWRENCE,

                                        Plaintiff,

                        -v-

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") ISAAC MOULTRY (Shield
No. 31543), SGT. JOHN O'CONNELL (Shield No. 3369),
P.O. JOSE PERALTA (Shield No. 12313), SGT. MICHEL
MARRERO (Shield No. 1778), P.O. JOHN DOE 1 through
4, P.O. JANE DOE and SUPERVISORY OFFICER
RICHARD ROE (the names John Doe, Jane Doe and
Richard Roe being fictitious, as the true names and shield
numbers are not presently known), in their individual and
official capacities,

                                        Defendants.

-------------------------------------------------------------------x

**FIRST AMENDED COMPLAINT
AND DEMAND FOR A JURY
TRIAL**

Index No. 12-CV-4273 (RWS)

Plaintiff DARRELL LAWRENCE, through his attorneys DAVID B. RANKIN and

DEBORAH B. DIAMANT of the Law Office of Rankin & Taylor, as and for his first amended

complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff DARRELL LAWRENCE's rights were violated when officers of the NEW YORK

   CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis

   seized, detained, arrested, searched and used unlawful force against him.  By reason of

defendants' actions, including their unreasonable and unlawful searches and seizures, plaintiff was deprived of his constitutional rights.

3. Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that plaintiff's claim arose in the Southern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

7. Plaintiff, DARRELL LAWRENCE, is and was at all times relevant to this action, a resident of the County and State of New York.

8. Defendant THE CITY OF NEW YORK ("CITY"), is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

9. New York City Police Department Officer ("P.O.") ISAAC MOULTRY (Shield No. 31543), SGT. JOHN O'CONNELL[1] (Shield No. 3369), P.O. JOSE PERALTA (Shield No. 12313), SGT. MICHEL MARRERO (Shield No. 1778), P.O. JOHN DOE 1 through 4, P.O. JANE

---

[1] SGT. JOHN O'CONNELL held the rank of police officer and Shield No. 29143 at the time of the incident described infra.

DOE and SUPERVISORY OFFICER RICHARD ROE (the names John Doe, Jane Doe and Richard Roe being fictitious, as the true names and shield numbers are not presently known) (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

10. The true names and shield numbers of defendants P.O. JOHN DOE 1 through 4, P.O. JANE DOE and SUPERVISORY OFFICER RICHARD ROE are not currently known to the plaintiff.[2] However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.M.L. § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name said officers as defendants in an amended pleading once the true names and shield numbers of said defendants becomes known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

11. The individual defendants are being sued in their individual and official capacities.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13. The individual defendants' acts hereafter complained of were carried out intentionally,

---

[2] By identifying said officers as "John Doe," "Jane Doe" and "Richard Roe," plaintiff is making no representations as to the gender of said officers.

recklessly, with malice, and in gross disregard of plaintiff's rights.

14. At all relevant times, the individual defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

15. Plaintiff LAWRENCE was maliciously and falsely arrested by the individual defendants on June 27, 2009, at approximately 5:22 p.m. near the intersection of West 65th Street and Amsterdam Avenue in the County and State of New York.

16. Minutes prior to his arrest, plaintiff LAWRENCE was inside the AMC Lowes Lincoln Square 13 Theater (hereinafter "AMC Lowes"), located on Broadway between West 67th and West 68th Streets in the County and State of New York, with his girlfriend preparing to watch a film.

17. Plaintiff LAWRENCE is a loyal patron of AMC Lowes because he works as a producer for the film industry in a location nearby the theater.  Plaintiff LAWRENCE regularly attends special screenings at AMC Lowes as part of his job functions, in addition to frequently enjoying films at the theater during his leisure time.

### May 13, 2009 Incident

18. A few weeks prior, on May 13, 2009 (hereinafter "May arrest"), plaintiff LAWRENCE, who is black, was racially profiled and stopped by undercover officers inside the theater as he awaited with tickets for the arrival of his friend so they could watch a film together. However, plaintiff LAWRENCE does not seek damages via the instant complaint for the May arrest.

19. Because the tickets plaintiff LAWRENCE held were dated for a previous screening and he had not yet approached the manager's desk to exchange the tickets for the current day's screening, defendant SGT. O'CONNELL, one of the undercover officers, insisted on accompanying plaintiff LAWRENCE to the manager's desk to see whether the tickets could be exchanged.

20. While en route to the manager's desk, defendant SGT. O'CONNELL explained AMC Lowes' management reported patrons' bags placed on the floor had been stolen from inside the theaters.  Plaintiff LAWRENCE, who was impeccably dressed in clothes that showed no signs of him crawling on the dirty floors of the movie theaters, explained repeatedly to defendant SGT. O'CONNELL he was a regular patron of the theater and routinely exchanged tickets.  During this discussion, plaintiff LAWRENCE's previous career as a member of the New York City Fire Department (hereinafter "Fire Department") became a topic of conversation.  Plaintiff Lawrence joined the Fire Department in 1979 and ended his career as a firefighter when he retired from the City of Mount Vernon Fire Department in 1996.

21. Upon reaching the manager's desk, the AMC Lowes manager greeted plaintiff LAWRENCE by name and explained to defendant SGT. O'CONNELL patrons are permitted to exchange unused tickets for a current day's screening.

22. Defendant SGT. O'CONNELL walked away from the manager's desk to speak with defendants P.O. DOE 1 through 3 for a few minutes.

23. The officers then approached plaintiff LAWRENCE and asked him if he had stated to defendant SGT. O'CONNELL whether he was a former or current member of the Fire Department.  Plaintiff LAWRENCE again explained he was retired from the Fire Department.

24. Nonetheless, defendant SGT. O'CONNELL arrested plaintiff LAWRENCE and swore out a false complaint that charged plaintiff LAWRENCE under New York Penal Law §§ 190.25(3), 165.40, and 165.15(9), to wit, criminal impersonation in the second degree, criminal possession of stolen property in the fifth degree, and theft of services.

25. Upon information and belief, it was not until after plaintiff LAWRENCE was arrested the officers learned the Family Court of the City of New York had issued a bench warrant for plaintiff LAWRENCE because he failed to appear for a court date of which he had not been informed.

26. After plaintiff LAWRENCE vacated the bench warrant, the Family Court provided plaintiff LAWRENCE with a "DO NOT ARREST" letter, which contained the following information:

**NOTICE TO POLICE**

**Docket No.** E-14640/06/06A

**TO ANY POLICE OFFICER:**

Do not arrest bearer, Darrell L. Lawrence, on warrant issued on 8/24/07.

The warrant issued by the Court on the above date has been disposed of by the Family Court in the above County.

If said warrant is produced for execution, please retain same with this notice and send it through official channels to the Family Court in the above County.

For further information in reference to the above, please call the Warrant Officer named below.

Detective Clyde Rush
646-386-5017

Date: May 22, 2009

/s/
Evelyn Hasanoeddin
Clerk of Court

**June 27, 2009 Incident**

27. On June 27, 2009, upon learning the run time of the film he intended to watch, plaintiff LAWRENCE determined he would need to exit the AMC Lowes in order to move his legally parked car from a two-hour parking spot to another location where the car could be left for the duration of the film.

28. As plaintiff LAWRENCE drove his car away from a parking spot located near the theater to find a spot where he could park his car for more than a couple of hours, he noticed a police car behind him.  Plaintiff LAWRENCE proceeded to look for a parking spot, eventually turning from West End Avenue onto West 65th Street.  Soon after turning onto West 65th Street, plaintiff LAWRENCE saw a parking spot and pulled in.  Immediately thereafter, he saw the patrol car's lights were on and he heard an officer instruct him over the car's loudspeaker system to turn off his car.

29. Defendants P.O. MOULTRY and P.O. DOE 4 approached plaintiff LAWRENCE's vehicle and requested plaintiff LAWRENCE's driver's license, vehicle registration, and insurance information.

30. Plaintiff LAWRENCE requested permission to obtain the vehicle registration and insurance information from his trunk.  The officers permitted him to exit his car in order to retrieve the documents from the trunk.

31. The officers saw the "DO NOT ARREST" letter with the vehicle registration and insurance information, and asked plaintiff LAWRENCE about it.  Plaintiff LAWRENCE responded it was a "DO NOT ARREST" letter and might help him in the current situation, as he did not yet know the purpose of the stop.  The officers did not read the letter nor did they ask further questions about it.

7

32. Defendant P.O. MOULTRY then stated, in sum and substance, "YOUR WINDOWS ARE TOO DARK."

33. Plaintiff LAWRENCE pointed out his windows were in the down position and defendant P.O. MOULTRY would have no way of knowing without further examination whether they were too darkly tinted.

34. Plaintiff LAWRENCE put the windows back into the up position and demonstrated to defendant P.O. MOULTRY the front windows were in compliance with the law.

35. Defendant P.O. MOULTRY responded incredulously, in sum and substance, "REALLY? ARE YOU A COP?"

36. Plaintiff LAWRENCE told him he was not a police officer, but that he is a retired firefighter.

37. After the officers spoke with one another for a few seconds, defendant P.O. MOULTRY returned to the front of the car and asked plaintiff LAWRENCE to exit his vehicle. Defendant P.O. MOULTRY then frisked plaintiff LAWRENCE.

38. Plaintiff LAWRENCE asked the officer why he was being frisked, to which defendant P.O. MOULTRY responded, in sum and substance, "LET ME JUST CHECK OUT WHO YOU ARE AND WHAT WE HAVE HERE BECAUSE I'M GOING TO HAVE TO GIVE YOU A TICKET FOR THE WINDOWS."

39. Plaintiff LAWRENCE got back into his vehicle and the officers returned to their patrol car where they sat for approximately fifteen minutes.

40. The officers then approached plaintiff LAWRENCE and instructed him to exit his car.

41. Defendant P.O. MOULTRY stated, in sum and substance, "YOU'RE UNDER ARREST. WE HAVE A WARRANT FOR YOUR ARREST."

42. Plaintiff LAWRENCE asked what the warrant was for and defendant P.O. MOULTRY refused to tell him.

43. Plaintiff LAWRENCE told defendant P.O. MOULTRY he should have handed him the "DO NOT ARREST" letter earlier.

44. Defendant P.O. MOULTRY responded, in sum and substance, "THAT'S NOT GOING TO HELP YOU NOW."

45. Soon thereafter two additional cars arrived at the arrest location: a patrol car and a small, unmarked vehicle.  P.O. JANE DOE exited the patrol car and officers present at plaintiff LAWRENCE's May arrest, including defendant SGT. O'CONNELL, exited the unmarked car.

46. Plaintiff LAWRENCE asked defendant SGT. O'CONNELL and the other officers present at the May arrest to inform defendant P.O. MOULTRY the Family Court warrant was vacated after plaintiff LAWRENCE's May arrest.

47. Defendant SGT. O'CONNELL and the other officers ignored plaintiff LAWRENCE's request.

48. Plaintiff LAWRENCE was transported to the 20th Precinct.  As he sat in a holding cell, defendant P.O. MOULTRY asked plaintiff LAWRENCE, in sum and substance, "DID YOU SAY YOU WERE A FIREFIGHTER?"

49. Plaintiff LAWRENCE asked the officer what his status as a retired firefighter had to do with his arrest.

50. Soon thereafter, defendant SUPERVISORY OFFICER RICHARD ROE, who had been present in the 20th Precinct at the May arrest, stopped by the holding cell and asked plaintiff

LAWRENCE, in sum and substance, "YOU'RE STILL TELLING THAT FIREFIGHTER STORY, LAWRENCE?"

51. Plaintiff LAWRENCE was moved to another cell where defendant P.O. MOULTRY arrived with a pen and paper and instructed plaintiff LAWRENCE to record the dates he was employed by the Fire Department.  Plaintiff LAWRENCE reminded defendant P.O. MOULTRY of the "DO NOT ARREST" letter and then refused to make any statements without first speaking with his attorney.

52. At approximately 10:30 p.m., plaintiff LAWRENCE was transferred to Central Booking where he remained overnight until he was arraigned at approximately 12:30 p.m. on June 28, 2009.

53. Defendant P.O. MOULTRY swore out a false complaint that charged plaintiff LAWRENCE under New York Penal Law § 190.25(3), to wit, criminal impersonation in the second degree.

54. On April 19, 2010, after approximately six court dates, plaintiff LAWRENCE's case was dismissed and sealed pursuant to New York Criminal Procedure Law § 30.30.

55. As a result of his June 27, 2009 false arrest, plaintiff LAWRENCE spent approximately 19 hours in police custody.

56. Plaintiff LAWRENCE began suffering from severe migraine headaches because of the stress caused to him by his arrest.  Subsequent to his arrest, plaintiff LAWRENCE was in the care of a neurologist to treat his migraines. He now must keep prescription medication on him at all times to prevent symptoms of a migraine from becoming a full on, debilitating migraine headache.  Plaintiff LAWRENCE's internist now monitors his migraines.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

57. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

58. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from having police officers fabricate evidence against him; and (f) freedom from deprivation of liberty without due process of law.

59. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

60. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

61. By failing to remedy the wrongs committed by his or her subordinates, in failing to properly train, screen, supervise or discipline his or her subordinates, and by personally participating in and ordering the constitutional injuries set forth above, defendants SGT. MICHEL MARRERO and SUPERVISORY OFFICER ROE caused damage and injury in violation of

plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments.

62. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**THIRD CLAIM**
**FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983**

63. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

64. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

65. Defendants SGT. O'CONNELL, SGT. MARRERO, P.O. PERALTA, P.O. JOHN DOE 1 through 4, and P.O. JANE DOE and SUPERVISORY OFFICER ROE were present for the above-described incident and witnessed another defendant, to wit, P.O. MOULTRY unlawfully arrest the plaintiff.

66. Defendant P.O. MOULTRY's use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendants SGT. O'CONNELL, SGT. MARRERO, P.O. PERALTA, P.O. JOHN DOE 1 through 4, P.O. JANE DOE and SUPERVISORY OFFICER ROE failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by other individual defendants.

67. The arrest of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant P.O.

MOULTRY which defendants SGT. O'CONNELL, SGT. MARRERO, P.O. PERALTA, P.O. JOHN DOE 1 through 4, P.O. JANE DOE and SUPERVISORY OFFICER ROE knew to be false, yet defendants SGT. O'CONNELL, SGT. MARRERO, P.O. PERALTA, P.O. JOHN DOE 1 through 4, P.O. JANE DOE and SUPERVISORY OFFICER ROE failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

68. Defendants SGT. O'CONNELL, SGT. MARRERO, P.O. PERALTA, P.O. JOHN DOE 1 through 4, P.O. JANE DOE and SUPERVISORY OFFICER ROE 's violations of plaintiff's constitutional rights by failing to intervene in other defendant's clearly unconstitutional use of force and clearly unconstitutional arrest of plaintiff resulted in the injuries and damages set forth above.

## FOURTH CLAIM
## _MONELL_ CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

69. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

70. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

71. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

72. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

73. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

   b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

      i.   in order to protect other officers; and/or

      ii.  in order to meet said productivity goals; and/or

   c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   e. Retaliating against officers who report police misconduct; and

   f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

74. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

   a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

   b. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for

recklessly using physical force; the plaintiff was engaged in expressive conduct, <u>to wit</u>, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

c. <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

d. <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[3]

e. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[4]

g. <u>Callaghan v. City of New York</u>, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct,

---

[3]     For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

[4]     For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_ quotas_woman_injured_in_2006_arrest_settles_for_750.html.

<u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[5]

h.  <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

i.  <u>Dunlop v. City of New York</u>, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

j.  <u>Carmody v. City of New York</u>, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

k.  <u>MacNamara v. City of New York</u>, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

l.  <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

m.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

n.  <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

o.  <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

p.  <u>Kunstler v. City of New York</u>, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiff's political beliefs);

q.  <u>Allen v. City of New York</u>, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders

---

[5]     For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/ 19critical.html?_r=1.

to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

r.  Dotson v. City of New York, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

s.  Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

t.  Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

u.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

v.  Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

w.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

x.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

y.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

z. Sorlucco v. New York City Police Department, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

aa. Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

75. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[6]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at."Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime.She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts.  "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[7]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month.  P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next

---

[6]     Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at*  http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[7]     Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at*http://www.nydailynews.com/ny_local/ 2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (*sic*) then."[8]

d. The New York Daily News obtained and published two (2) internal memos, which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[9]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[10]

f. In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[11]

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[12]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a

---

[8] *Id.*

[9] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[10] Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

[11] Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[12] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

factor in evaluating an officer's performance.[13] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[14]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[15]

j.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[16]

---

[13]  William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[14]  Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[15]  *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

[16]  Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

76. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

   a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

   > In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[17]

   b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

   c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[18]

   d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that

---

[17]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[18]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[19]  When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[20]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[21]

77. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[22]

---

[19]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[20]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[21]     Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[22]     Mollen Commission Report, p. 36.

[…]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[23]

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[24]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[25] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the

---

[23]     Mollen Commission Report, pp. 40-41.

[24]     Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[25]     Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[26]

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[27]

e. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

---

[26] *Id.*

[27] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

24

> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[28]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[29]

f.  In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer[30] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.  In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[31]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[32]

78. The existence of the aforesaid unconstitutional customs and practices, **specifically with**

   **regard to the practice or custom of discouraging police officers from reporting the**

---

footnotes

[28]   Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[29]   John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[30]   In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[31]   *Id.*

[32]   David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

**corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

79. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

80. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or

fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

81. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but not limited to, the constitutional rights enumerated in paragraph "58" above.

82. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

83. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

84. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

85. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein.  Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

86. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

87. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

**<u>JURY DEMAND</u>**

88. Plaintiff demands a trial by jury in this action on each and every one of their damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.      For such other further and different relief as to the Court may seem just and
        proper.

Dated:   New York, New York
         October 19, 2012

                                            Respectfully submitted,


                              By:    _____/s/_____
                                     David B. Rankin
                                     Deborah B. Diamant
                                     Law Office of Rankin & Taylor
                                     *Attorneys for the Plaintiff*
                                     350 Broadway, Suite 701
                                     New York, New York 10013
                                     t: 212-226-4507